UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

RMS OF WISCONSIN, INC.,

    Plaintiff,

    v.                                                 Case No. 13-CV-1071

S-K JV and J.F. SHEA CONSTRUCTION,
INC.,

    Defendants.

---

DECISION AND ORDER ON PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

---

On February 3, 2015, RMS of Wisconsin, Inc., was granted leave to file a third amended complaint against Shea-Kiewit Joint Venture and J.F. Shea Construction, Inc. (collectively the "defendants"). (Docket # 67.) In the third amended complaint, RMS, a subcontractor who is a certified by the City of Indianapolis as a minority and/or women owned business, alleges fraud in the inducement, breach of contract, and breach of the covenant of good faith and fair dealing against the defendants stemming from a subcontractor agreement it entered into with the defendants. (Third Am. Compl., Docket # 68.) RMS alleges the defendants never intended to honor the contract, but rather used RMS to fulfill a requirement imposed by the City of Indianapolis to employ women and minority owned business enterprises. (*Id.*) The defendants deny these allegations and have counterclaimed against RMS for breach of the subcontractor agreement. (Defendants' Ans. and Countercl., Docket # 70.)

Both parties now move for partial summary judgment. The defendants move for summary judgment on RMS' fraud in the inducement claim. (Docket # 93.) RMS moves for summary judgment on its breach of contract claim, asking the Court to find that the subcontract between the parties is a "lump sum" contract as opposed to a "time and materials" contract. (Docket # 79.) The issues have been fully briefed and are ready for resolution. For the reasons that I explain in this decision, the defendants' motion for partial summary judgment is granted and the plaintiff's motion for partial summary judgment is granted.

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which

would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

**UNDISPUTED FACTS**

RMS performed excavating and shaft digging work for Shea/Kenny, a J.F. Shea Construction joint venture, on the Milwaukee Metropolitan Sewerage District deep tunnel project ("Milwaukee Project") for more than six years. (Pl.'s Resp. to Defs.' Proposed Statement of Facts ("DPF") ¶ 1, Docket # 112.) On August 11, 2010, the City of Indianapolis and the Sanitary District of the City of Indianapolis sold the rights to the Indiana Deep Rock Tunnel Project to CWA Authority Inc./Citizens Energy Group. (Defs.' Resp. to Pl.'s Statement of Proposed Material Facts ("PPMF") ¶ 1, Docket # 138.) The asset purchase agreement contained a provision stating that the purchaser would establish policies and procedures designed to provide minority business enterprises ("MBE"), women-owned business enterprises ("WBE"), veteran-owned business enterprises ("VBE"), and local firms with "the maximum practicable opportunity to compete for work" related to the provision of wastewater treatment services in the Indianapolis community. (*Id.* ¶ 3.) The provision further contained annual goals for the percentage of contracts awarded to MBEs, WBEs, and VBEs. (*Id.*)

Near the Milwaukee Project's end, Shea approached RMS to see if it would be interested in working with Shea on the Indianapolis Deep Tunnel Project ("Deep Tunnel Project") as a "Minority/Women Business Enterprise." (Pl.'s Resp. to DPF ¶ 2.) In its bid to the City of Indianapolis, the defendants warranted that they had made a good faith effort to meet the goal of awarding 14% of the their subcontracting dollars to MBEs, 8% to WBEs, and .2% to VBEs. (Defs.' Resp. to PPMF ¶ 5.) Carl Christensen, J.F. Shea's Vice President of Operations, urged Tammy Miramontes, the owner of RMS, to have RMS apply for WBE certification with the City of Indianapolis. (*Id.* ¶ 6.) RMS was ultimately certified as a WBE in August 2011. (*Id.*; Pl.'s Resp. to DPF ¶ 3.)

Shea contacted RMS to begin negotiating the details of the subcontract and scope of work and the parties met at a pre-bid meeting in August of 2011 in Indianapolis, and on October 5, 2011 in Atlanta. (Pl.'s Resp. to DPF ¶ 4.) On September 8, 2011, J.F. Shea Vice President, Dennis Poulton, wrote to the City of Indianapolis Department of Public Works to inform the City that S-K JV was revising its Minority/Women Business Enterprise participation goals to 15% MBE, 8% WBE, and 3% VBE. (Defs.' Resp. to PPMF ¶ 7.) In his September 8th letter, Poulton wrote that "SK, JV understands in conference with the Owner, this procedure is consistent with the Asset Purchase Agreement between the City of Indianapolis and Citizens Energy Group/CWA, Authority, Inc. as the plan follows the current existing lines of business associated with the Agreement." (*Id.* ¶ 8.)

At the Atlanta meeting, the parties discussed rates and what equipment RMS should bring to the project. (Pl.'s Resp. to DPF ¶ 5.) The parties also discussed what Shea equipment S-K JV wanted RMS to transport to Indianapolis from the Milwaukee and Illinois equipment yards. (*Id.* ¶ 6.) At the meeting, RMS was told that things were going to

4

"run the same way as [they] did in Milwaukee," meaning that RMS would be doing the same sort of work that it did in Milwaukee. (*Id.* ¶ 7.)

In November of 2011, S-K JV (a joint venture between Shea and Kiewit Infrastructure Co.) was awarded the Deep Tunnel Project contract. (*Id.* ¶ 8.) S-K JV sent a proposed subcontract to RMS on December 19, 2011. (*Id.* ¶ 9.) RMS supplied its list of equipment and its equipment rates to the defendants before signing the contract. (Def.'s Resp. to PPFOF ¶ 14.) RMS signed and returned the subcontract on or about January 24, 2012. (Pl.'s Resp. to DPF ¶ 10.) On January 1, 2012, Stuart Lipofsky, S-K JV's project manager, called RMS's owner Tammy Miramontes and told her to mobilize RMS's men and equipment to the Indianapolis jobsite. (*Id.* ¶ 11.) On January 3, 2012, RMS employees began bringing equipment to Indianapolis. (*Id.* ¶ 12.) Other RMS employees commuted back and forth moving equipment. (*Id.* ¶ 13.) On either January 2 or January 3, 2012, RMS began work on site setup and prep and continued work onsite thereafter. (*Id.* ¶ 14.) Daily Reports show that RMS "met w/ Bob," Shea's foreman on the project, and "planned for next week." (*Id.* ¶ 15.) RMS brought its own equipment and employees to the jobsite and used its own employees and equipment to perform its scope of work. (*Id.* ¶ 16.) On January 16, S-K JV's office manager, Donnalynn Hansen, wrote "we had these two gentlemen come in this morning and I was told they would be on your payroll but that is all I know." (Def.'s Resp. to PPMF ¶ 16.) However, RMS never requested these employees. (*Id.* ¶ 17.)

RMS submitted weekly applications for payment for its work on the project. (Pl.'s Resp. to DPF ¶ 17.) Defendants paid RMS a total of $467,947.77 and received broad claim and lien waivers from RMS for all of the payments. (*Id.* ¶ 19.) With each pay application, RMS submitted backup documentation to justify the time worked by RMS employees as

5

well as union hall laborers and equipment operators, the cost of materials furnished by RMS, and the expenses incurred by RMS for supplies. (*Id.* ¶ 20.) For example, RMS submitted time sheets for its employees, receipts for reimbursement for expenses such as: "office," "travel," gas, tolls, lodging, postage, and meals, among other things. (*Id.* ¶ 21.) Defendants paid RMS's first two pay applications in full. (*Id.* ¶ 22.) Subsequently, however, Defendants began paying only certain line items, and questioning others. (*Id.* ¶ 23.) RMS acknowledged that S-K JV was disputing its rates. Tammy Miramontes expressly wrote in an email to Hansen on February 27, 2012: "Rick is NOT changing or agreeing to any other rates than the one's on the sheet that I faxed over to you." (*Id.* ¶ 24.) And in response to Hansen's statement on February 27, 2012 that Lipofsky "said he will not pay until he gets the new price list and there is some kind of agreement on rates," Tammy Miramontes writes: "the rate sheet you have is the rates for this job." (*Id.* ¶ 25.)

On February 20, 2012 Lipofsky called Tammy Miramontes and asked her to fly to Indianapolis for a meeting regarding disputed charges. (*Id.* ¶ 28.) On February 24, 2012, Tammy Miramontes, Rick Wilinski, and Scott Miramontes of RMS met with Lipofsky, Hansen, Danny Martz, and Jim Eichberger of S-K JV. (*Id.* ¶ 29.) During the meeting Lipofsky stated that there had been a misunderstanding and RMS was charging labor, management fees, and equipment rates that were too high. (*Id.* ¶ 30.) According to Tammy Miramontes, Lipofsky "had issues with the management fee charged on the invoice[s]," and he "had an issue with the monthly expenses." (*Id.* ¶ 31.) Tammy Miramontes' notes from the meeting show that equipment rates and monthly expenses were discussed. (*Id.* ¶ 32.) The February 24 meeting did not satisfy RMS, so they called Christensen to discuss their concerns. (*Id.* ¶ 33.)

6

Christensen called Tammy Miramontes and told her that he and Jeffrey Salai (J.F. Shea's vice president) would like to meet with RMS to discuss matters further. (*Id.* ¶¶ 34-35.) During the conversation, Christensen stated that the "situation had to be resolved soon or we could all go to jail." (*Id.* ¶ 36.) The parties arranged to meet in Milwaukee on March 13, 2012. (*Id.* ¶ 37.) At the meeting, Christensen discussed with Tammy Miramontes and Wilinksi the money that S-K JV owed to RMS. (*Id.* ¶ 38.) According to Tammy Miramontes, Salai stated that there had been a misunderstanding, and asked Tammy Miramontes, "You didn't really think you were getting a $6.785 million contract, did you?" (*Id.* ¶ 39.) In settlement, S-K JV agreed to pay $124,852.61 for unpaid invoices and truck rental costs, out of the roughly $153,000.00 in unpaid invoices. (*Id.* ¶ 40.) The agreement was memorialized in a document entitled "Final Adjustment to Progress Pymts thru 3/09/12." (*Id.* ¶ 41.) S-K JV offered to pay RMS a management fee at a rate of $8,500.00 per month going forward, which RMS alleges was to do menial tasks to give the appearance that S-K JV was using a WBE subcontractor. (*Id.* ¶¶ 42, 44.)

## ANALYSIS

*Choice of Law*

As an initial matter, I must determine the applicable law governing this dispute. When a district court exercises diversity jurisdiction, it must apply the choice of law principles of the state in which it sits. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). Therefore, Wisconsin's choice of law principles apply. The choice of law is made on an issue-by-issue basis. *International Administrators, Inc. v. Life Insurance Co.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985). RMS alleges both breach of contract and fraud in the inducement. The subcontract agreement at issue in this case contains a choice of law

7

provision providing that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Indiana." (Third Am. Compl., Exh. D at 15, Docket # 69-1.)

As a general rule, Wisconsin law recognizes validly executed choice of law provisions in the absence of any public policy reasons to disregard them; however, this is true primarily of contract disputes. *Taurus IP v. Daimler Chrysler Corp.*, 519 F. Supp. 2d 905, 923 (W.D. Wis. 2007) (citing *Bush v. National School Studios, Inc.*, 139 Wis. 2d 635, 642, 407 N.W.2d 883 (1987)). Tort claims generally fall outside the scope of choice of law provisions. *CERAbio LLC v. Wright Medical Technology, Inc.*, 410 F.3d 981, 987 (7th Cir. 2005) (citing *Kuehn v. Children's Hospital*, 119 F.3d 1296, 1302 (7th Cir.1997)). A choice of law provision may be construed to govern tort disputes, but only if "it is clear that this is what the parties intended." *Kuehn*, 119 F.3d at 1302.

Thus, Indiana law applies to RMS' breach of contract claim under the choice of law provision in the subcontract agreement. However, RMS' fraud in the inducement claim is not subject to the provision because it is unclear whether the parties intended Indiana law to cover tort claims. When a choice of law provision does not apply, the law of the forum state generally applies unless it is "clear" that the contacts in the nonforum state are of "greater significance" than the contacts in the forum state. *State Farm Mutual Automobile Insurance Co. v. Gillette*, 2002 WI 31, ¶ 51, 251 Wis. 2d 561, 641 N.W.2d 662. However, if the laws of the competing states are the same, courts in Wisconsin apply the law of Wisconsin regardless of the relative state contacts. *CERAbio LLC*, 410 F.3d at 987 (citing *Deminsky v. Arlington Plastics Machinery*, 259 Wis. 2d 587, 657 N.W.2d 411, 420 (2003)).

With regard to the alleged tortious behavior, the parties do not argue that their contacts in Indiana are of greater significance than their contacts in Wisconsin. Nor do the parties point to a substantial difference in Indiana and Wisconsin law on the law of fraud in the inducement. Moreover, Indiana and Wisconsin law appear equivalent for fraud in the inducement. *See Tru-Cal, Inc. v. Conrad Kacsik Instrument Systems, Inc.*, 905 N.E.2d 40, 44-45 and n.6 (Ind. Ct. App. 2009) (stating that the elements of fraud are (1) a material representation of past or existing facts which (2) was false, (3) was made with knowledge or reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) proximately caused injury to the complaining party and noting that fraudulent inducement occurs "when a party is induced through fraudulent misrepresentation to enter into a contract"); *Kaloti Enterprises, Inc. v. Kellogg Sales, Co.*, 2005 WI 111, ¶¶ 12, 30, 283 Wis. 2d 555, 699 N.W.2d 205 (stating the following elements for fraud in the inducement: (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment). Therefore, I will apply Wisconsin law to the issue of fraud in the inducement.

*Fraud in the Inducement*

The defendants move for summary judgment on RMS' claim for fraud in the inducement. As state above, to prevail on a claim for fraud in the inducement, RMS must prove that the defendants made "a statement of fact that is untrue, made with the intent to defraud, and for the purpose of inducing the other party to act on it, which the other party

9

relies on to his or her detriment, where the reliance is reasonable." *Kailin v. Armstrong*, 2002 WI App 70, ¶ 31, 252 Wis. 2d 676, 702, 643 N.W.2d 132, 145-46; *see also Kaloti Enterprises, Inc. v. Kellogg Sales, Co.*, 2005 WI 111, ¶¶ 12, 30, 283 Wis. 2d 555, 699 N.W.2d 205; *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 52, 262 Wis. 2d 32, 662 N.W.2d 652. Further, the misrepresentation must have occurred before the formation of the contract. *Kaloti Enterprises*, 2005 WI 111, ¶ 30; *Digicorp, Inc*, 2003 WI 54, ¶ 52. A plaintiff must prove the elements by "'clear, satisfactory, and convincing evidence.'" *Digicorp, Inc*, 2003 WI 54, ¶ 52 (quoting Wis. JI-Civil 205, Burden of Proof: Middle).

Once again, to prove fraud in the inducement, one needs a false statement of fact. "[A]n action for misrepresentation cannot be based on future events or facts not in existence when the representation was made, or on unfulfilled promises." *Schurmann v. Neau*, 2001 WI App 4, ¶ 10, 240 Wis. 2d 719, 624 N.W.2d 157. One exception to this rule is "when at the time of making the promises the promisor has a present intention not to perform." *Constr. Mortgage Investors Co. ("CMIC") v. VWH Dev., LLC*, 2009 WI App 56, ¶ 5, 317 Wis. 2d 732, 768 N.W.2d 64 (unpublished).

At its core, RMS alleges the type of fraud described by the court in *CMIC*, a "present intention not to perform." *See id.* In its Third Amended Complaint, RMS alleges that the defendants falsely represented to RMS that they intended for RMS to fully complete the subcontracting work for the Deep Tunnel Project and that it would pay the full $6,785,000.00 value of the contract; however at the time the subcontract was signed, the defendants knew that they did not intend to honor the agreement. (Third Am. Compl. ¶¶ 60-61.) As evidence of this fraud, RMS points to these facts: the defendants were aware of RMS' equipment prices prior to entering into the contract so their contention that the

10

contractual relationship ultimately failed because the parties disputed equipment prices is untrue; the defendants were making unauthorized purchases on RMS' behalf and putting employees on RMS' payroll; and Christensen's statement that "we could all go to jail."

The defendants' principal argument is that the parties were performing under the contract without disputes for several weeks and that partial performance of the contract evidences the defendants' intent to perform. The defendants rely on two Wisconsin cases in support of their position, *Wausau Med. Ctr. v. Asplund*, 182 Wis. 2d 274, 514 N.W.2d 34 (Ct. App. 1994) and *CMIC*. In *Wausau Med. Ctr.*, the defendant signed an employment contract that contained a covenant not to compete. Forty-five days after he started his employment, the defendant informed his employer that he was quitting. His former employer sued him for intentional misrepresentation, arguing that the defendant intentionally mispresented his interest in returning to work for the plaintiff. The court found that the defendant's statement did not meet the second element of misrepresentation—that the representation was false—because he did, in fact, return to work for the plaintiff. 182 Wis. 2d at 291, 514 N.W.2d at 42. In *CMIC*, the parties entered into a subordination agreement in which Maple Lawn agreed that CMIC's mortgage would have priority. Maple Lawn argued that CMIC made various promises with regard to the loan and asserted that it would not have entered into the agreement if not for CMIC's assurances. Thus, Maple Lawn argued that CMIC fraudulently induced it to sign the subordination agreement. In finding for CMIC on this claim, the court considered the fact that CMIC did partially perform under the agreement and "[t]his bit of performance negates any inference that it never intended to perform." 2009 WI App 56, ¶ 8.

RMS argues that the defendants did not partially perform under the contract because Miramontes wrote to Hansen that the only payroll S-K JV paid was for Indiana employees,

11

Miramontes expressed concern over Lipofsky refusing to make progress payments, and because S-K JV "haggled over RMS performing the work from the start." (Pl.'s Br. in Opp. Defs.' Mot. Summ. Judg. at 18-19, Docket # 115.) However, the record shows that between January 25, 2012 and March 18, 2012, RMS submitted invoices to the defendants and the defendants paid the invoices, subtracting the amount paid from the contract price of $6,785,000. (Declaration of Mark M. Leitner ("Leitner Decl.") ¶¶ 13-17, 24-25, 28, 30, 33-35, Exhs. 11-15, 22-23, 26, 28, 31-33, Docket # 127.) RMS does not dispute that the defendants paid RMS a total of $467,947.77 and received broad claim and lien waivers from RMS for all of the payments. (Pl.'s Resp. to DPF ¶ 19.) The fact that RMS did perform work and was paid under the subcontract negates the inference that the defendants never intended to honor the agreement. Thus, because RMS cannot show that an untrue factual representation was made, the defendants are entitled to summary judgment on RMS' fraud in the inducement claim.

*Interpretation of the Contract*

The parties dispute whether their contract was for time and materials or was a lump sum contract. RMS has moved for partial summary judgment, asking the Court to find that the contract is a lump sum contract. This issue requires me to construe the terms of a written contract and therefore involves a pure question of law. *See Whitaker v. Brunner*, 814 N.E.2d 288, 293 (Ind. Ct. App. 2004). When construing the meaning of a contract, my primary task is to determine and effectuate the intent of the parties. *Id*. First, I must determine whether the language of the contract is ambiguous. *Id.* The "unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts." *Id.* (internal quotation and citation omitted). If the language of the instrument is unambiguous, the parties' intent will

be determined from the four corners of the contract. *Id.* at 293-94. If, however, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact-finder. *Id.* at 294. When interpreting a written contract, I attempt to determine the intent of the parties at the time the contract was made. *Id.* I do this "by examining the language used in the instrument to express their rights and duties." *Id.*

Once again, the parties dispute whether the contract was a lump sum or a time and materials contract. "Generally construction contracts are either fixed price contracts, in which the parties agree on a specific price for the entire job, or time and materials contracts, in which the parties agree that the builder will be paid according to the time and materials used in the job." 6 Ind. Law Encyc. Contracts § 97 (West 2015). In fixed price contracts (also known as lump sum contracts), the "contractor receives one fixed price for performing the work no matter how costly it is to perform, subject to certain possible price adjustments for changed conditions, or changes or delays imposed by the owner." 2 Bruner & O'Connor Construction Law § 6.71 (2015). In a time and materials contract, "a contractor will be reimbursed for labor at an hourly rate that includes profit and overhead and is typically negotiated and not necessarily based upon costs. Material may be reimbursed at a set unit fee negotiated between the parties, or at cost plus a percent fee." 2 Bruner & O'Connor Construction Law § 6.83 (2015).

Both parties argue that the extrinsic evidence supports their respective positions. However, as stated above, if a contract is unambiguous, the extrinsic evidence is irrelevant. My interpretation of an unambiguous contract must "give effect to the intention of the parties as expressed in the four corners of the instrument." *See Trustees of Indiana Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind. Ct. App. 2009). Both parties are sophisticated. Had they

13

intended to enter into a time and materials contract, they could have drafted the contract as such. Rather, I find that the contract language unambiguously shows a lump sum contract. The contract language clearly states that the contractor agrees to pay the subcontractor the sum of $6,785,000 for "the full and complete performance of the Work." (Exhibit D to Third Am. Compl., Docket # 69-1 at 5.) This is the only price found in the contract. Section 29 of the contract, which is entitled "Scope of Work and Unit Price," articulates the work to be performed by RMS and states that "[a]ll work described in the Scope of Work" shall be performed at the following amount—$6,785,000. (*Id.* at 17-18.) The method of payment further indicates that the contract is a lump sum contract. Section 3 of the contract states that payments would be made to RMS "in an amount equal to one hundred percent (100%) of the value of the Work" and that "progress payments will be wire transferred weekly." (*Id.* at 5.) In fixed price contracts, "progress payments are typically based upon the percentage of the project completed." Bruner & O'Connor Construction Law § 6.71.

      The nature of the contract as a lump sum agreement becomes more apparent when considered in conjunction with the section that allows for price adjustments. As previously stated, even in lump sum agreements, the contract may provide for price adjustments. *See id.* Section 5 of the contract at issue contains such a provision. (Docket # 69-1 at 7-8.) In order for RMS to be paid for additional work not covered by the contract, RMS was required to submit a breakdown of all costs associated with the additional work, including labor, equipment, and materials. (*Id.* at 7.) Thus, it seems the additional work is paid on a time and materials basis. However, the contract contains no such requirement (i.e., submitting a cost breakdown) for payment of work covered by the contract. Further, the contract specifically states in the "Scope of Work and Unit Price" section that "[a]ny Items of Work

14

for which a fixed price is not agreed to shall be performed on a cost plus basis. For any Items of Work performed on a cost plus basis, the Subcontractor will submit to the Contractor labor time sheets, invoices for all supplies and materials purchase, and any other documentation required by the Contractor." (*Id.* at 18.) This provision confirms that the work articulated in the contract is paid on a "fixed price," (i.e., lump sum) basis and any additional work is paid on a "cost plus" (i.e., time and materials) basis.

The defendants argue that even if the "form of the agreement were a lump sum contract," the parties mutually modified the contract to a time and materials contract through their conduct. The defendants principally rely on RMS' billing method, arguing that RMS' billing practices were consistent with a time and materials contract where the subcontractor receives reimbursement for the costs it incurs, plus a fee. (Defs.' Resp. Br. at 11-12, Docket # 123.) Specifically, the defendants argue that RMS billed it in a manner consistent with a time and materials contract because it billed for the costs of labor payroll, equipment, overhead charges for RMS' office, a "management fee," vehicle expenses, travel expenses, and a 3% mark-up fee. (*Id.*)

While it is true that modification of a contract can be implied from the conduct of the parties, *City of Indianapolis v. Twin Lakes Enterprises, Inc.*, 568 N.E.2d 1073, 1084-85 (Ind. Ct. App. 1991), the record evidence does not establish a mutual agreement to change the contract from a lump sum to time and materials. To begin, even assuming that RMS billed on a time and materials basis, the billing method alone does not establish the nature of the contract. *Rotsko v. Rice*, 221 A.D.2d 915 (N.Y. App. Div. 1995) is instructive on this point. In *Rotsko*, the court found that the contract unambiguously was a "not to exceed" contract in which the plaintiff agreed to construct the defendant's house at a guaranteed maximum

15

price of $300,000, despite the fact the plaintiff billed the defendant on a time and materials basis. *Id.* at 916. RMS' billing practice was similar. Even though RMS was not specifically billing based on a percentage of work that it had completed (which is typically how a lump sum agreement is billed), it is clear that each application for payment noted the "original contract sum" of $6,785,000 and subtracted from that number the "total completed and stored to date," to get the "balance to finish, including retainage." (Leitner Decl. ¶¶ 13-17, 24-25, 28, 30, 33-35, Exhs. 11-15, 22-23, 26, 28, 31-33, Docket # 127.) Thus, each application for payment completed a portion of the $6,785,000 total and the amount RMS was to receive was not going to exceed that amount. This billing confirms the fact the contract was for a fixed price of $6,785,000. As such, I find that the contract between the parties was for a lump sum. RMS' motion for partial summary judgment is granted.

## CONCLUSION

Both parties have moved for partial summary judgment. The defendants have moved for summary judgment on RMS' fraud in the inducement claim. Because I find that RMS has not shown that a the defendants made a statement of fact that is untrue, the defendants' motion for partial summary judgment is granted and RMS' fraud in the inducement claim is dismissed. RMS has moved for partial summary judgment asking me to construe the subcontract agreement and determine that the agreement is a lump sum contract. I find that the plain language of the subcontract agreement demonstrates a lump sum contract. As such, RMS' motion for partial summary judgment is also granted.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for partial summary judgment (Docket # 93) is **GRANTED** and the plaintiff's fraud in the inducement claim is dismissed.

**IT IS FURTHER ORDERED** that the plaintiff's motion for partial summary judgment (Docket # 79) is **GRANTED** and it is determined that the parties' subcontract agreement is a lump sum contract.

**IT IS FURTHER ORDERED** that the clerk of court shall contact the parties to set a scheduling conference to discuss scheduling this matter for trial. The parties are to confer regarding proposed trial dates prior to the conference.

Dated at Milwaukee, Wisconsin this 31st day of December, 2015.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge