# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RMS OF WISCONSIN, INC.,**

     **Plaintiff,**

     **v.**                         **Case No.  13-CV-1071**

**S-K JV and J.F. SHEA CONSTRUCTION, INC.,**

     **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS'
## *DAUBERT* MOTION

---

Currently before me is S-K JV and J.F. Shea Construction, Inc.'s motion to bar the testimony of RMS' damages expert, Michael Betters, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Docket # 89.) I conducted a *Daubert* hearing on the defendants' motion on May 10, 2016. Betters testified, as well as the defendants' damages expert, Terence Rodgers. For the reasons discussed below, the defendants' motion is granted.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert*. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b)

the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The inquiry consists of three general areas: (1) the testimony must be "helpful," which dovetails with the relevance requirements of Fed. R. Evid. 401–403; (2) the expert must be qualified by knowledge, skill, experience, training, or education; and (3) the testimony must be reliable and fit the facts of the case. *Lyman v. St. Jude Medical S.C., Inc.*, 580 F. Supp. 2d 719, 722 (E.D. Wis. 2008).

Under the third part of the analysis, the Court examines whether (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The Court acts "as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001). To help ensure the reliability of expert testimony, the Court considers, for example, whether the theory can be and has been verified by the scientific method through testing, whether the theory has been subjected to peer review, the known or potential rate of error, and the general acceptance of the theory in the scientific community. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); Fed. R. Evid. 702 advisory committee's note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

2

# ANALYSIS

RMS seeks to admit expert evidence of its damages stemming from the defendants'
alleged breach of the subcontract, including lost profits and other categories of damages.
(*Daubert* Hearing, Pl.'s Ex. 1, Ex. I at 95.)[1] It offers the opinion of Michael Betters who
opines that RMS' total damages amount to $1,774,540.00; the bulk ($1,543,523.17) of this
consists of lost profits. (*Id.*) The defendants challenge Betters' expert opinion principally on
his calculation of RMS' projected lost profits from the Indianapolis Project; however, they
also challenge his opinion regarding RMS' other alleged categories of damages. I will
address each in turn.

### 1.    Lost Profits

As a preliminary matter, the defendants do not challenge Betters' qualifications to
render an expert opinion on lost profits. However, it is worth noting Betters' experience
here. Betters is a Certified Management Accountant and has been operating Betters &
Associates, S.C. since 1992. (Declaration of Michael Betters ("Betters Decl.") ¶ 2, Ex. 1,
Docket #119-1.) Betters has worked as a tax preparer and provided outside accounting
services for RMS since May 2005. (*Id.*)

Betters testified that every industry calculates lost profits differently. (12:10:25-
12:10:31.)[2] The defendants' damages expert, Terence Rodgers, similarly testified that the
calculation of lost profits depends on the industry. (1:38:16-1:39:06.) Betters testified that his
past experience of calculating lost profits included two cases of calculating lost revenue
while the businesses were closed after fire losses, one case of calculating lost revenue while a

---

[1] I recount the background of this case in my previous decision on RMS' *Daubert* motions (Docket # 164) and I
will not repeat it here.
[2] I cite to the audio recording of the hearing.

3

business was closed after a flood loss, and a valuation of a business for purposes of determining a couple's assets for a divorce. (9:21:03-9:22:12.) He acknowledged that he has never before put together a lost profits report "to [the] extent" of the one he completed for RMS. (9:22:12-9:22:18.) Thus, Betters has not previously offered expert lost profit opinion in a construction industry case. Nonetheless, "[g]enerally speaking, expert qualifications are liberally construed" *Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 474 (N.D.N.Y. 2004), and as indicated earlier, defendants do not challenge Betters' qualifications. Accordingly, if qualifications were the only shortcoming, Betters' testimony might be admissible. However, since his testimony will be excluded for other reasons, I will not further address his qualifications.

The crux of the problem here is that Betters' opinion is not based on sufficient facts or data. First, in calculating RMS' expenses, Betters begins with historical data from RMS' past contract with the defendants on the Milwaukee Deep Tunnel Project. (Declaration of Jessica Farley ¶ 3, Deposition of Michael Betters ("Betters Dep."), Ex. B, Docket #91-2 at 55, 112-13.) This use of historical data may make sense if both contracts were lump sum contracts. However, the parties do not dispute that the Milwaukee Project was done on a time and materials basis (Pl.'s Resp. to Def.'s Add. Proposed Material Facts ¶ 2, Docket # 130), and Betters acknowledged that while lump sum contracts can be more profitable, they require the subcontractor to take on more risk, including the risk of making no profit (Betters Dep. at 129-30). This, however, is not a risk with a time and materials contract. (*Id.* at 130.) Betters testified that he had no historical data as to RMS' profitability on a lump sum contract. (*Id.* at 129.) And while RMS argues that it has performed nine lump sum

4

contracts in the past, it acknowledges that none were of the size and scale of the Indianapolis Project. (Pl.'s Resp. Br. at 5 n.1, Docket # 118.)

Given the fact that RMS had never performed a lump sum contract of the magnitude of the Indianapolis Project, RMS needs to show "credible comparable evidence or business history" sufficient to allow the fact finder to reasonably ascertain future lost profits. *See T & HW Enterprises v. Kenosha Associates*, 206 Wis. 2d 591, 605 n.6, 557 N.W.2d 480, 485. While a plaintiff need not prove damages with "mathematical precision," the evidence must enable the jury "to make a fair and reasonable approximation." *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 189, 557 N.W.2d 67, 80 (1996). Thus, it seems that using historical data is an appropriate tool to use in reasonably ascertaining future lost profits. However, Betters fails to explain why or how the historical conditions in the Milwaukee Project are sufficiently similar or comparable to the conditions of the Indianapolis Project—both as to the type of contract and the scope of work—such that the Milwaukee Project's data can reliably project future loss in Indianapolis. As such, I am not convinced that Betters has shown that the Milwaukee Project data is credible comparable evidence.

Next, the defendants argue that the major flaw in Betters' opinion is his calculation of RMS' labor costs. I agree. Betters testified that he determined RMS' labor rate by taking actual hourly rates from the payroll records from the approximately two months RMS worked on the Indianapolis Project and averaged them, then added payroll taxes, to come up with an average hourly rate for labor of $37.99. (*Daubert* Hearing, Pl.'s Ex. 1, Ex. C.) Betters then took RMS' equipment rate sheet for the Indianapolis Project, which lists ten different pieces of equipment, added up the costs of the equipment with an operator, and

5

divided by ten, to get the average cost of $133.00. (*Daubert* Hearing, Pl.'s Ex. 1, Ex. J.) Betters assumed that the ten pieces of equipment would be used equally; however, he testified that he did not attempt to verify this based on how the equipment was actually used during the two months on the job. (10:33:34-10:35:38.) Betters then divided $37.99 by $133.00 to get a percentage of 28.56%. (10:36:26-10:37:14.) Betters determined that 28.56% represented the average cost of labor per hour of revenue. (*Daubert* Hearing, Pl.'s Ex. 1, Ex. C.) Betters multiplied 28.56% by the contract sum of $6,785,000.00 to get $1,938,061.00 as the total labor cost. (*Daubert* Hearing, Pl.'s Ex. 1, Ex. A.) Betters then divided $1,938,061.00 equally over five years to get $387,612.00 per year. (*Id.*) After making adjustments for the cost of living each year, Betters determined that RMS' labor costs would have been $1,984,574.00. (*Id.*)

I am not convinced of the propriety of using an average of all employees' hourly rates from those two months of payroll on the Indianapolis Project. The average includes the rates for both union workers and management employees. Presumably these employees are performing vastly different types of work and the payroll records show greatly differing amounts of hours performed by each employee. (Ex. C at 37.) Thus, how does lumping these categories of employees together create an accurate hourly rate for all employees?

Also, it is unclear how averaging the cost of operated equipment for ten machines appropriately determines the revenue side of the equation. Rick Wilinski, RMS' field and jobsite supervisor, averred that while he intended RMS to use the ten pieces of equipment in Exhibit J, it was impossible to estimate before the job began how many man-hours each of the pieces of equipment would be used. (*Daubert* Hearing, Defs.' Ex. 4, Declaration of Rick Wilinski ("Wilinski Decl.") ¶ 1, 4-5.) He stated that vehicles were often used on an "as-

6

needed" basis. (*Id.* ¶ 5.) Thus, Betters does not explain why the average is a good representation when it was quite possible some of the equipment on the list may not be used at all.

Further, I find Betters' use of a five year mark to complete the Indianapolis Project to be questionable. Although the Milwaukee Project took five years to complete, Betters simply assumes that the Indianapolis Project would similarly take five years to complete. He does nothing to independently verify that the scope and type of work was sufficiently similar to the Milwaukee Project that it would take the same amount of time to complete. Betters testified that he did not have a projection of the numbers of hours it would take to complete the job, the scope of the job, or a timeline in which to complete the job. (9:27:44-9:29:13.) He further testified that he never reviewed any estimates created by RMS (10:27:05-10:27:13), despite the fact that Wilinski stated that he prepared an analysis of the total labor costs associated with the project as part of the bidding process (Wilinski Decl. ¶ 2).

If it is unclear that RMS could have indeed finished the Indianapolis Project in five years, this calls into question Betters' entire projection. As Betters acknowledged, RMS' potential revenue was capped at $6,785,000.00—the price of the lump sum contract. (10:43:23-10:46:39.) RMS' costs, however, were limited only by the scope of the work. (*Id.*) For this reason, the scope of the work and the number of hours needed to complete the work are vital components to the equation of lost profits because RMS would need to complete the work even if its costs exceeded $6,785,000.00. Betters acknowledges these vital components are missing. (*Id.*) Betters testified that the data he had to do his lost profits calculations was "not the best scenario" and agreed that he would have liked to have a projection of the hours needed to complete the work and a timeline for the project in doing

7

his calculations. (12:05:26-12:06:00.) He further testified that he estimated labor costs as a percentage of sales because he did not have the numbers of hours necessary to complete the job and when comparing the percentage to RMS' historical work, he believed he was "in the ballpark" of its historical labor costs. (11:08:30-11:08:46.)

In assessing whether an expert's testimony is based on sufficient facts or data, "[i]t is critical . . . that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). As the Supreme Court stated in *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." This is precisely the case here. I find the analytical gap between the data used and Betters' opinion in this case is simply too great. RMS has not shown that Betters' testimony is based upon sufficient facts or data.

Beyond the insufficiency of the data supporting Betters' testimony, I also find Betters' methodology unreliable. As both Betters and Rodgers testified, lost profit calculations are inherently fact and industry specific. But Betters pointed to no reliable principles and methods used in his discipline. He did not testify that any accounting sources or authority supports his method. He testified that his methodology for calculating lost profits was effectively to sort through the data his client gives him, find what information he thinks is best for calculating lost profits, and make his assessment. (12:05:26-12:06:00.) He stated that his procedure for calculating lost profits or valuing a business is to "use whatever tools I have in front of me to try to make the most accurate educated estimate of loss I

8

possibly can." (12:01:53-12:02:34.) He stated that if he does not have the requisite tools, he goes to the next best thing he has. (12:03:23-12:03:24.) This *ad hoc* method of calculating lost profits cannot be independently verified or tested because it has been created for the specific situation at hand. As Betters acknowledged, his calculation was circular. (11:00:32-11:00:41.) The uniqueness of the case cannot justify using a method that cannot be tested or replicated. *See Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). Thus, Betters' testimony is not the product of a reliable methodology. For these reasons, Betters' opinion as to RMS' lost profits must be excluded.

2.     *Other Categories of Damages*

The defendants also challenge Betters' testimony regarding other categories of damages claimed by RMS, namely: losses from sale of assets for less than fair market value because the loss of the Indiana contract put a cash flow squeeze on RMS; the value of equipment that was stolen in a break-in at the site; money spent to upgrade equipment used on the job; and miscellaneous other costs including recoupment of a reduction in the equipment rates that RMS and the joint venture negotiated, and accounting and attorney fees incurred by RMS in connection with the project. (Defs.' Br. at 19, Docket # 90.) The defendants argue that Betters did nothing more than add up the figures given to him by RMS and for that reason, expert testimony is unnecessary. (*Id.*) RMS does not challenge the defendants' argument; rather, it simply argues that it is entitled to those damages whether "Betters or a representative of RMS" testifies on the subject. (Pl.'s Resp. Br. at 8.) At the *Daubert* hearing, Betters acknowledged that the summary of these damages involved no professional analysis on his part and that he was simply passing on numbers given to him by Tammy Miramontes (the president of RMS). (11:34:05-11:37:32.)

9

I agree that all Betters is doing is adding up numbers given to him by RMS and thus his testimony does nothing to assist the trier of fact. *See United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir. 1972) (upholding the exclusion of testimony of accounting expert "when it became evident that he would do no more than make basic arithmetical computations with figures supplied to him by counsel"). Thus, Betters will also not be permitted to testify as to these categories of damages found in Exhibits E-H and summarized in Exhibit I of his expert report.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion to strike plaintiff's damages expert Michael Betters (Docket # 89) is **GRANTED**.


Dated at Milwaukee, Wisconsin this 16th day of May, 2016.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge

Case 2:13-cv-01071-NJ   Filed 05/16/16   Page 10 of 10   Document 168